ROBERT F. HERRICK, administrator, *vs.* CLARA F. DENNETT.

SAME *vs.* SAME.

SAME *vs.* SAME.

Suffolk.    March 18, 19, 1909. — June 24, 1909.

Present : KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Gift, Inter vivos.*

In a suit in equity by an administrator against a woman, to recover possession of two hundred and fifty-one negotiable bonds alleged to belong to the estate of the plaintiff's intestate, it appeared that the plaintiff's intestate had amassed a fortune of nearly a million dollars, that he was a married man living apart from his wife, and for the thirty years previous to his death had lived with the defendant, that he supported her in comfort during his life and intended to give her the means of living in still greater comfort after his death, that he often stated that he did not intend to make provision for her by a will, for wills could be broken, that nearly two years before his death the intestate had executed an assignment or bill of sale to the defendant of the two hundred and fifty-one bonds in question, enumerating them by their names and numbers, and that he performed thereafter a series of acts intended to operate as a gift of the bonds to the defendant, with the result that two weeks before his death the bonds and the assignment or bill of sale were in one of three tin boxes in a safe deposit compartment of the intestate and on this tin box the intestate had put a card bearing the name of the defendant, that, previous to this, the intestate with the permission of the defendant had cut off all but a few of the coupons and had collected most of them on his own account, that in another of the three tin boxes in the compartment were securities belonging to the intestate which he did not attempt nor intend to give to the defendant, that the attorneys of the intestate appointed by him to go to the safe deposit compartment were the defendant and a bank president, who was an intimate friend of the intestate, that at first these attorneys were appointed to go to the compartment during his lifetime, but that, afterwards, on finding that this was so, he had changed the power so as to authorize them also to go to the compartment after his death, that there were two keys to the compartment, one of which the intestate gave to the bank president and the other of which he kept himself, that the tin boxes inside had no keys, that two weeks before he died the intestate told the defendant to go to his desk (in the room they were in) where his keys were and bring them to him, that she did so, that he then said " Those are the keys to the vault.  I want you to take those keys off of that bunch and keep them, and don't let any one have them, they belong to you," that there was a small ring or bunch of four keys on a large ring or bunch of keys, that this smaller ring or bunch of keys the defendant took and kept, that one of them was the key of the safe deposit compartment which had been kept by the intestate, that another was the key to a small tin box that always stood on the intestate's desk in the house where he lived with the defendant, that the third was the key of that desk, and what the fourth one was did not appear, that, at the time

that the intestate executed the assignment or bill of sale of the bonds to the defendant, he had executed and delivered to her a bill of sale of all the furniture in the house in which they lived, that during the last four days of his life the intestate was unconscious most of the time, that two days before he died the defendant, accompanied by a lawyer, whom the intestate had informed of his gift of the bonds to the defendant and who had promised the intestate that he would see that the defendant had her rights, went to the safe deposit compartment, opened it with the key given to the defendant by the intestate, and took out the tin box marked with the defendant's name, that they then removed the box to the bank, of which the intestate's intimate friend was the president, and with him opened the tin box which contained the two hundred and fifty-one bonds and the assignment or bill of sale transferring them to the defendant, that they checked off the bonds and found that they agreed with the list in the bill of sale, and then the lawyer hired a safe for the defendant in another safe deposit vault and put the bonds and the assignment or bill of sale in it, where they were when the intestate died two days later. The judge of the Superior Court who heard the case found for the defendant, and made a decree dismissing the bill, from which the plaintiff appealed. This court, after a careful examination of the evidence found that there was a valid gift of the bonds to the defendant; that, what would have been the result if the intestate had not given the defendant the small bunch of keys two weeks before he died, it was not necessary to consider, because that act and the intestate's declaration which accompanied it constituted a completed gift *inter vivos*, and the removal of the bonds by the defendant and the lawyer who went with her was authorized by the intestate.

LORING, J. These three cases were heard together by a judge without a jury. The first is a bill in equity brought by the administrator of the estate of George S. Wellman to recover two hundred and fifty-one negotiable bonds which had belonged to the plaintiff's intestate during his lifetime. The other two are actions for the conversion of some of the bonds. The defense set up in all three of the cases was the same, to wit, that the bonds were given by the plaintiff's intestate to the defendant during his lifetime. The judge * found for the defendant in all three. The suit in equity is here on an appeal on all the evidence, the evidence having been taken by a commissioner. Each of the two actions at law is here on an exception taken to the refusal to rule that as matter of law no gift had been made out. The evidence taken in the equity suit is made part of each bill of exceptions.

After a careful examination of the voluminous evidence, we find in the suit in equity that there was a valid gift of these bonds to the defendant.

---

* *Wait*, J.

The plaintiff's intestate amassed a fortune of nearly a million dollars in a so-called business carried on by a corporation named the Metropolitan Stock Exchange. For years before his death he was a married man living apart from his wife. He died on November 1, 1903. For some thirty years before that date he had lived with the defendant. He supported her in comfort during his life, and there can be no question but that he intended to give her the means of living in still greater comfort after his death. He often stated that he did not intend to make provision for her by way of a will, for wills could be broken.

Before the first one of the acts which resulted in a valid gift to her of the bonds here in question (as a gift *inter vivos*), he had created or taken steps toward creating a trust for himself for life, with remainder to the defendant. Such a paper was drawn up and was signed in the presence of I. R. Clark, Esquire, who had been counsel for the intestate's corporation for many years, and in Mr. Clark's presence was put into a tin box at the Winthrop National Bank in which the intestate kept his securities. Whether it ever became operative is not altogether clear on the evidence. There was some conflict in the evidence as to that. It is not necessary however to come to a determination on that point, for the instrument signed by the intestate contained a power of revocation and it was revoked by him later on. This deed of trust was signed in 1897 or 1898. The only significance of the matter here is that it shows the intestate's intention to provide for the defendant.

Just before January 8, 1902, the intestate wrote out with his own hand an absolute assignment to the defendant of the two hundred and fifty-one bonds here in question. The assignment is in these words:

" I hereby transfer, convey and deliver to Clara F. Dennett of Boston Mass. the following property, as her sole and absolute property forever — viz.

" Four (4) City of Newton — Nos. 1674–81–82–83 "

[Then follows a similar description of two hundred and forty-seven other bonds.]

This assignment was written by the intestate at 236 Huntington Avenue, where the intestate and the defendant lived together. He had with him at the time a list of the bonds from which he made the list set forth in the assignment. On the morning of January 8, 1902, he went with the defendant to the Winthrop National Bank, then in the Sears Building in Boston, and asked Mr. Evans, the president of the bank, to witness a transfer of a box by him (the intestate) to the defendant. The intestate and his corporation each kept an account with the Winthrop Bank, and in the words of its president, one Evans, he formed " an acquaintance " with the intestate which was " very intimate." The intestate had for years kept in the bank's vault a tin box containing his securities. At the intestate's request this tin box was taken into the president's room where the president, the intestate and the defendant were present. The assignment had been or was then signed by the intestate and was witnessed by the cashier and a clerk of the bank. Exactly when this was done is not clear, and is of no consequence. The intestate then tied a tag to the tin box, on which was written the defendant's name, the assignment was put inside the box and the box was passed to the defendant. The intestate called on the president to witness that he delivered the box and its contents to the defendant, the bill of sale then being in the box. He then locked the box and put the key in his pocket and the president of the bank was asked to keep the box. The president did so until June of that year. Whether this box contained other bonds in addition to the two hundred and fifty-one here in question is not clear. Apparently it did. It seems to have been the only place where the intestate kept his securities.

Evans testified that the intestate told him that in case of his death he was to deliver the bonds and the box to the defendant.

In the following June the intestate went to the bank and asked for the box. The president refused to give it to him until he produced an order from the defendant. Thereupon, under date of June 26, an order in the writing of the cashier of the bank directed to the president of it was signed by the defendant. This order asked the president to " deliver my tin box in your custody to Mr. Geo. S. Wellman." At the bottom of this order is a receipt signed by the intestate for " a tin box marked Clara

F. Dennett." All the coupons originally attached to the two hundred and fifty-one bonds falling due after January 8, 1902, which were collected before November 1, 1903 (the date of the intestate's death), were cut off and collected by the intestate. A few were found after the intestate's death in a box in which his own securities were found, and a few had not been cut off.

Although there is some doubt upon the point, on the evidence it is pretty clear that the tin box remained at the Winthrop Bank until July 7 of the following year (1903).

The defendant went to Europe on June 4, 1903, and returned on the fifteenth day of the following August.

Evans, the president of the Winthrop Bank, repeatedly told the intestate that a bank was not the proper place for bonds and other securities, and urged him to take a safe deposit box. As a result the intestate came to the Winthrop Bank on July 7, 1903, received the tin box from a clerk, and accompanied by Evans went across the street to the Old Colony Trust Company. He was there identified by Evans, and hired a compartment with three tin boxes in it. He appointed as his attorneys to go to the compartment during his lifetime the defendant and Evans. Evans objected to being made such an attorney, but the intestate said "I want it so," and Evans acquiesced. The intestate then put the two hundred and fifty-one bonds here in question in one of the three tin boxes and his own securities in one of the others. In the first box he also put the assignment of January 8, 1902, and on the outside of it he put a card on which was the name of the defendant. There were no keys to the three tin boxes. The Old Colony Trust Company gave the intestate two keys to the compartment which he had hired and in which these three tin boxes were. The intestate went back to the bank and gave Evans one of these two keys. The other he kept himself.

The intestate then went to Saratoga, where he had a racing stable. He was at that time a sick man. He had had typhoid fever in 1901, and never was well after that. He died of cirrhosis of the liver and complications accompanying it, on November 1, 1903, as we have said.

In the second week in August he was sick in bed in Saratoga, but insisted (against the remonstrance of a friend who told him

that he was too sick to do so) on going to Boston. He told this friend: "I have got to go to Boston. . . . I am going to meet Clara. . . . We are going to Boston, and we are going to settle this business, once and for all. I am going to deliver this property to Miss Dennett," "or," as the friend testified in explanation, "to Clara. He always spoke of her as Clara." He previously had told this friend: "I have provided for Clara well. She can have all the things that she has wanted for a number of years, and that I haven't given her." "She can have them now, but I don't want her to have horses and carriages and automobiles now, for various reasons." This he had told the friend repeatedly, at Saratoga at this time.

The intestate met the defendant at New York on her arrival there, and they came to 236 Huntington Avenue on Sunday, August 16. He was sick in bed there for several days. But on the twentieth he went to the Winthrop Bank, and at his request Evans ascertained from the Old Colony Trust Company that the power of attorney which he had given to Evans and the defendant did not permit them to go to the safe after his death. Thereupon he signed a paper stating that Evans and defendant were to have access to the safe notwithstanding his death, and agreeing to indemnify and save the Trust Company harmless from all loss suffered by it from giving access to either of them in good faith. Evans testified that when the intestate came in to the bank and asked him to find out whether, as the order then stood, he (Evans) and the defendant would have access to the safe after his death, he looked as if something seemed to be preying on his mind that he wanted to get straightened out.

On the same day the intestate and the defendant went to the Trust Company, and the intestate had the box containing the two hundred and fifty-one bonds and the assignment or bill of sale brought into one of the coupon rooms and put on a table. The box was then opened and the intestate said to the defendant: "Take those bonds out and look at them. . . . Every one of these are yours." The defendant then took all the bonds out of the box, then the bonds and the bill of sale were put back in the box, the intestate locked the safe with his key and he and the defendant left together. The next day they went to Saratoga. While

they were at the Trust Company the defendant signed her name as one of the intestate's attorneys, and a description of her was taken by the Trust Company.

The intestate and the defendant returned from Saratoga to Boston on September 28 or 29. The next day the intestate went to the office of Mr. Clark who, as we have said, had been counsel for the Metropolitan Stock Exchange for many years, and who had taken part in drawing the trust deed. Mr. Clark testified that the intestate looked sick and bloated, and that he (the intestate) told him that he had been tapped for dropsy while at Saratoga. Mr. Clark then testified as follows: " Then he [the intestate] said, ' I have — what I came in for was to say that I have taken a box in the safety deposit vault ' — I cannot recall that he named in what vault — ' for Miss Dennett, and I have placed in that box all the securities that I have conveyed to her by the bill of sale. They are not now at the Winthrop Bank, and she has been down with me and has signed for the box, and I have taken the securities, and have,' he said, ' what you call made a delivery of them to her. She has taken the box and taken the securities themselves.' He got up — he finished his call and got up and went out of my door into the main office, and then turned sharply round and came back, and says, ' If any trouble ever comes from this transaction I want you to give me your word that you will see that Miss Dennett has her rights.' And then he says, ' I want you to shake hands on it,' and I gave him my hand. Then he turned and went away, and that was the last time I ever saw him."

Two weeks before he died the intestate told the defendant to go to his desk (in the same room) where his keys were and bring them to him. She did so. He then said, " Those keys are keys to the vaults. I want you to take those keys off of that bunch and keep them, and don't let any one have them, they belong to you." There was a small ring or bunch of four keys on a larger ring or bunch of keys. This smaller ring or bunch of four keys the defendant took and kept. One of the four was the key of the compartment in the Old Colony Trust Company kept by the intestate; another was the key to a small tin box that always stood on his desk at 236 Huntington Avenue; a third was the key to that desk; and it did not

appear what the fourth was. It appeared that the intestate had made to the defendant a bill of sale of all the furniture in 236 Huntington Avenue at the same time that he executed the bill of sale of the bonds on January 8, 1902.

On October 29, 1902, Evans came to 236 Huntington Avenue to see the intestate. The defendant told him that the intestate was very sick and would not know him. Evans and the defendant then had a conversation lasting some thirty minutes. There is a conflict in the evidence as to what was said at this time. But as a result of this conversation the defendant on the next day went to the Winthrop Bank and Evans summoned Clark by telephone. Clark came to the bank, and after some conversation asked Evans to accompany him and the defendant to the Old Colony Trust Company. Evans declined. Clark and the defendant then went to the Trust Company and opened the intestate's compartment with the key given to the defendant by the intestate. They took out the box marked Clara F. Dennett. Clark then returned to the bank and asked to have a clerk sent over with some wrapping paper. Evans sent a clerk over, who wrapped the box up in paper and brought it to the bank. There the box was opened in the presence of Evans, Clark and the defendant and the securities found in it were checked with the bill of sale of January 8, 1902, which was also in the box with them. Nothing else was in the box. The securities and the list agreed. Mr. Clark then hired a safe for the defendant in the Equitable Safe Deposit vaults and put the securities and the bill of sale in it. They were there when the intestate died two days later, on November 1.

The intestate was unconscious most of the time during the last four days of his life. During the first two of these four days he could be roused, but on the later days it was more and more difficult to rouse him.

The plaintiff's contention is that it was the intention of the plaintiff's intestate that he was to have the control of these bonds during his life and that they were to become the defendant's on his death but not before. That the gift to the defendant was a testamentary one only and so void since the statute of wills had not been complied with. He relies on *Howe* v. *Ripka*, 199 Mass. 359. We need not consider what would have been the result if

it had not been that the intestate gave the defendant the small bunch of keys two weeks before he died, and if she had not taken the bonds into her possession as her own before his death. The plaintiff has argued that four keys were given to the defendant and not the key to the compartment in the Old Colony Trust Company's vault only. But the other two of the four (about which anything is known) were keys to furniture which had been given to the defendant by a bill of sale drawn up and executed when the assignment of the two hundred and fifty-one bonds here in question was drawn up and executed. In addition to that the intestate said: "I want you to . . . keep them, and don't let any one have them, they belong to you." It is to be remembered that there was another key to the safe in the Old Colony Trust Company in Evans's possession, and there was another tin box in the safe containing the intestate's securities not given to the defendant. So the intestate might well say to the defendant "That key of the vault is yours."

We are of opinion that in doing what they did on October 30, Mr. Clark and the defendant were within the authority given them by the intestate.

There was much evidence in addition to that which we have stated, showing that the intestate had said that he had given the bonds to the defendant and that they were hers, before the keys were delivered to her two weeks before he died. In spite of that it is not clear that the intestate had intended to part with all dominion over them until the time when the keys were delivered to her.

Also it is not clear that until then he had given her possession of them. She had to get a key to the compartment in the Old Colony vaults before she could actually get possession of them.

But when the intestate gave the defendant the key of the compartment in the Old Colony vaults and the other keys (namely, the two keys to the furniture given to the defendant), the gift of these bonds which the intestate had been attempting to make for nearly two years became a completed gift, and that coupled with what took place on October 30 gave the defendant possession of them. The gift became a valid present gift of the bonds *inter vivos* during the lifetime of the intestate.

The result, is that the decree in the suit in equity must be affirmed with costs, and the exceptions in the two actions at law must be overruled.

*So ordered.*

*S. L. Whipple, (H. H. Armington & H. H. Bond* with him,) for the plaintiff.

*R. M. Morse, (G. F. Ordway* with him,) for the defendant.